IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL  DIVISION

| | | |
|---|---|---|
| IOWA CABLE AND TELECOMMUNICATIONS ASSN. and MEDIACOM COMMUNICATIONS CORPORATION, | * * * * * | 4:06-cv-256 |
| Plaintiffs, | * * | |
| v. | * * | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, | * * * | |
| Defendant. | * * * | ORDER |

On May 30, 2006, Plaintiffs, Iowa Cable and Telecommunications Association ("ICTA")

and Mediacom Communications Corporation ("Mediacom"), filed a Complaint for Declaratory

and Injunctive Relief (Clerk's No. 1), challenging decisions made by Defendant, the United

States Department of Agriculture ("USDA"), to issue certain loans under Title 7, United States

Code § 950bb.  On July 31, 2006, Defendant filed a Motion to Dismiss (Clerk's No. 3), pursuant

to Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction.  Plaintiffs

resisted the motion on September 6, 2006 (Clerk's No. 6) and Defendant replied (Clerk's No. 9).

A hearing was held on Defendant's motion on November 21, 2006.  The matter is fully

submitted.

## I.  FACTUAL BACKGROUND

### A. *The Plaintiffs*

Plaintiff ICTA is a corporation established under the laws of the State of Iowa, with its

headquarters in Clive, Iowa.  ICTA's members include companies providing cable television,

high speed internet, and telephone service to communities throughout the State of Iowa.  One

purpose of ICTA is to represent its members' interests in ensuring the fair and efficient

deployment of communication technologies in Iowa.

Plaintiff Mediacom is a corporation established under the laws of the State of Delaware,

with its headquarters in Middletown, New York.  Mediacom is a member of ICTA and

specializes in providing cable and broadband services to communities whose relatively low

population densities make them unattractive to many other providers.

B.  *The Statute*

The Rural Electrification Act ("REA") was originally established in 1936 in an effort to

provide electrical services to rural parts of the United States.  It was amended in 1949 to include

telephone service.  In 2002, Congress again amended the REA by enacting the Farm Security

and Rural Investment Act (the "Farm Bill"), designed to further the spread of broadband

technologies in rural areas.  *See* Pub. L. 107-171, 116 Stat. 134, *codified as amended at* 7 U.S.C.

§ 950bb.  Consistent with general provisions of the REA, Section 6103 of the Farm Bill

authorizes the USDA "to provide loans and loan guarantees to provide funds for the costs of

construction, improvement, and acquisition of facilities and equipment for broadband service in

eligible rural communities."   The USDA administers the statute through its Rural Utilities

Service ("RUS").

Under the Farm Bill, "broadband service" is defined as "any technology identified by the

Secretary [of Agriculture] as having the capacity to transmit data to enable a subscriber to the

service to originate and receive high-quality voice, data, graphics, and video."  7 U.S.C. § 950bb

(b)(1).  An "eligible rural community" is "any area of the United States that is not contained in

an incorporated city or town with a population in excess of 20,000 inhabitants." *Id*. §
950bb(b)(2).  The Farm Bill also provides that "the Secretary shall give priority to eligible rural
communities in which broadband service is not available to residential customers." *Id*. §
950bb(c)(2).

To implement the provisions of the Farm Bill, the RUS established the Rural Broadband
Access Loan and Loan Guarantee Program (the "RUS Program"), and in 2003, issued
regulations setting forth eligibility criteria and application processes for RUS Program loans.
The RUS Program regulations provide, amongst other things, that "priority will be given to loans
to finance service to eligible rural communities in which broadband service is not available to
residential customers in the applicant's proposed service area."  7 C.F.R. § 1738.11(a).  In
determining whether broadband service is "not available," the RUS must consider the following
criteria: (1) whether broadband service is "not being provided to residential customers in the
applicant's proposed service area and no entity is committed to provide such service before the
service would reasonably be expected to be available pursuant to the loan application"; (2)
whether broadband service "is not provided at rates comparable to those of similar services in
neighboring urban and suburban areas"; and (3) "the quality of existing service, including . . . the
availability of specified data rates, system latency, and date rate restrictions, is not satisfactory as
determined by RUS." *Id*. § 1738.11(b)(1-3).

In applying for a loan under the statute, the RUS requires applicants to submit a
completed application, which must include a certification of the extent to which broadband
service is available or not available to residential customers as provided in § 1738.11(b)(1-3).
*Id*. § 1738.11(c).  The applicant must also publish legal notice stating an intent to offer

broadband service in a particular community, setting forth the proposed service area, and requesting incumbent broadband providers to submit to RUS within 30 days various information regarding the incumbent's broadband services in the area.  *Id.*  First priority is to be given to applications in areas where broadband service is not available to residential customers.  7 C.F.R. § 1738.15.  The regulations also provide exclusivity to the first approved applicant, i.e., "RUS will not approve loans to more than one applicant to provide broadband service within the same eligible rural community, nor to an applicant proposing to provide service in a community served by a borrower using funds under this part regardless of the definition of broadband service at the time of loan approval."  *Id.* § 1738.19(h).

Plaintiffs note that the RUS regulations do not provide any means for incumbent broadband providers, or for the public, to intervene, comment on, or otherwise participate in the loan application process, even when material misstatements and omissions have been made about the incumbent's service.  Compl. at ¶ 13.  The regulations do not provide a mechanism for incumbent service providers or the public to determine the scope of the applicant's proposed plan, who would be served, who would not be served, the technology used, the level of service proposed, or anticipated pricing.  *Id.*  Finally, the regulations do not provide a mechanism for submission of competing proposals or for RUS to conduct a comparison of competing proposals. *Id.*  Plaintiffs also point out that, while the RUS regulatory program is designed to make broadband service available in otherwise unserved or underserved areas, in practice it has become a means of subsidizing new providers of cable television.  Compl. ¶ 14.

In September 2005, the USDA's Office of the Inspector General ("OIG") issued a report after conducting an audit of the administration of the RUS Program.  The Audit Report found,

amongst other things, that RUS had improperly used the program to fund broadband service for

suburban communities; that RUS failed to give priority to programs for unserved communities;

that RUS had subsidized new entrants in already served areas without determining whether the

area could support multiple broadband providers; and that RUS had granted loans despite

incomplete applications, inaccuracies, and/or misrepresentations.   The Audit Report found that

the RUS Program's focus "has shifted away from those rural communities that would not,

without Government assistance, have access to broadband technologies."  Compl. ¶ 22 (quoting

USDA, OIG, Audit Report: Rural Utilities Service Broadband Grant and Loan Programs (Sept.

2005)).  The Audit Report concluded that the RUS Program "has not satisfactory implemented

statutory requirements for serving rural instead of suburban areas," and that it had failed to

"guarantee that communities without preexisting service receive priority."  *Id*.

## C.  *Plaintiffs' Complaint*

In challenging the way the RUS administers the mandates of the Farm Bill, Plaintiffs

specifically challenge a recent § 950bb application, and its approval by the RUS, for an entity

called Local Internet Service Company ("LISCO"), to provide broadband service in Fairfield,

Iowa.   According to Plaintiffs' Complaint, on April 15, 2005, LISCO published legal notice (the

"Notice") in the Fairfield Daily Ledger, stating that it was a prospective applicant for an RUS

loan to provide broadband service in Fairfield.  Compl. ¶ 24.  The Notice instructed incumbent

providers to complete and submit a Legal Notice Response Form within 30 days, but did not set

forth the geographic boundaries LISCO proposed to serve, the technology LISCO proposed to

use, the prices it intended to charge, or other information that might be relevant to the proposed

service community or to competing providers.  *Id*.  On April 19, 2005, LISCO filed with the

RUS an application for a subsidized loan to provide broadband service in Fairfield.  *Id.* ¶ 25.
The filing was updated on August 24, 2005.  *Id.*

At the time LISCO made application for a loan with the RUS, Mediacom was already
providing broadband service in Fairfield.  *Id.* ¶ 26.  Mediacom had acquired the cable television
system in Fairfield in 2001 for approximately $7.8 million, as part of a larger transaction.
Following acquisition of the cable system, Mediacom spent an additional $1 million to upgrade
it and to interconnect it to the Mediacom network within Iowa and throughout the Midwest.  *Id.*
In July 2002, Mediacom launched advanced services in Fairfield, including broadband internet
access service.  *Id.*  Since the launch of broadband service in Fairfield, Mediacom "has steadily
invested additional funds to keep both the facilities and products state-of-the art.  It presently
offers broadband service over that network at speeds and prices comparable to those of
surrounding urban and suburban areas."  *Id.*

While Mediacom did not see the Notice published by LISCO in the Fairfield Daily
Ledger, it became aware of a pending RUS Program application for Fairfield upon viewing the
USDA's RUS website in late May 2005.  Mediacom returned the Legal Notice Response Form,
which requested very general information about its preexisting broadband service in the
proposed service area.  "The form requested few details about the extent or quality of the
incumbent provider's preexisting broadband service within the relevant area.  RUS Program
regulations do not provide preexisting providers such as Mediacom with any method by which to
submit additional information on pending RUS loan applications—or any way to contest
misleading statements and misrepresentations made in connection with those applications."  *Id.* ¶
28.

Despite Mediacom's broadband presence in Fairfield, the RUS approved a $9.475 million loan to LISCO to provide broadband service to Fairfield in November 2005.  Mediacom and other entities that might have been eligible to apply for RUS Program loans are now precluded from applying for an RUS Program loan to expand or improve service to the Fairfield area, pursuant to 7 C.F.R. § 1738.19(h).  According to Plaintiffs, critical information about LISCO's proposed broadband service and the terms of RUS's approval was substantially unknown to Mediacom until Mediacom received a redacted copy of LISCO's application on April 21, 2006, in response to a Freedom of Information Act request to the USDA in early December 2005.  Upon reviewing the redacted application, Mediacom learned that LISCO made numerous misstatements to the USDA in support of its loan application, despite language requiring a warranty that "[a]ll information, reports, and other documents and data submitted to the RUS in connection with the Application were, at the time the same were furnished, complete, and correct in all material respects."[1]  Compl. ¶ 32.

In March 2006, Mediacom representatives raised its complaints about RUS's

---

[1] Specifically, Mediacom claims that LISCO's application contained numerous inaccuracies regarding Mediacom's existing service in Fairfield.  For example, LISCO's application provided that Mediacom provides a maximum of 78 video channels, no audio channels, and no High-Definition content.  The application also states that Mediacom's current infrastructure is based on a 350 MHz coaxial cable system.  According to Mediacom, at the time of LISCO's representations, Mediacom provided 194 video channels, 9 High-Definition channels, 46 audio and music channels, and a state-of-the-art 860 MHZ capacity system.  Compl. ¶ 39.  LISCO also represented to the RUS that Mediacom provides Fairfield with download speeds of up to 3 Mb and upload speeds of up to 128k.  According to Mediacom, at the time of LISCO's application, it provided residential download speeds of 5 Mb and upload speeds of 256k, as well as commercial speeds of up to 6 Mb download and 1 Mb upload, plus custom fiber solutions for businesses with network speeds of up to 1 Gb.  *Id.* ¶ 40.  Further, LISCO represented that it would be able to provide Video on Demand service at download speeds faster than Mediacom and made predictions about the content and pricing of its video services.  According to Mediacom, these assertions were unrealistic on their face to anyone with knowledge of the industry.  *Id.* ¶ 41.

administration of the loan program to USDA Under Secretary Thomas Dorr and RUS

Administrator Andrew in a meeting hosted by Senator Charles Grassley of Iowa.  *Id*. ¶ 34.  At

the meeting, Mediacom expressed concern that the RUS Program was straying from its statutory

purpose.  In the same month, Mediacom met with RUS Administrator Andrew and his staff to

recommend that incumbent providers and the public be permitted to participate in the loan

application process.  Mediacom has not received any official response from the USDA in regards

to the March 2006 meetings, and has fully exhausted its administrative remedies.  *Id*.  ¶ 37.

        According to Plaintiffs, the erroneous statements of LISCO in its loan application caused

the RUS to necessarily fail "to accurately consider and weigh its own mandatory regulatory

criteria."  Compl. ¶ 42.  Further, the RUS has not, to date, declared any default in connection

with LISCO's loan application, despite language in the documentation providing that an event of

default occurs when material misrepresentations are made in the application.  *Id*. ¶ 43.  Plaintiffs

also point out that the information, correct or not, provided in LISCO's loan application, makes

it clear that the RUS did not comply with its own guidelines in approving a loan to LISCO.

Specifically, the application made clear that broadband service in Fairfield was already being

provided both by Mediacom and by Iowa Telecom Systems; the application made no

representation that the loan would be used to extend service to customers unserved or

underserved by the existing broadband providers; the application made no estimate of the

number of unserved or underserved broadband customers in Fairfield; and the application

focused primarily on improving cable television service, rather than broadband service in

Fairfield.  According to Plaintiffs, by approving LISCO's application, the RUS "diverted loan

program money to build duplicative facilities in an area which already had three incumbent

providers, at least one of which provides high-quality broadband service at reasonable cost." *Id.* ¶ 47.

The LISCO loan, according to Plaintiffs, highlights the manner in which the USDA is making decisions to issue loans under the RUS Program in a manner that is "arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law." *Id.* ¶ 48. Further, the RUS's approval of the LISCO application has caused and will continue to cause irreparable injuries to Mediacom and other ICTA members, who have no monetary damages remedy against the RUS for those injuries. Mediacom specifically urges that it is damaged and will be damaged by government-subsidized competition that would not otherwise exist, but for the RUS inappropriately granting loans.

## II. LEGAL STANDARD

This Court, as a court of limited jurisdiction, has a duty to assure itself that it has subject matter jurisdiction in every case. *See Barclay Square Props. v. Midwest Fed. Sav. & Loan Ass'n of Minneapolis*, 893 F.2d 968, 969 (8th Cir. 1990); *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987). Defendant contends that Plaintiffs' Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because it fails to establish that Plaintiffs have standing to bring the present action, and thus, the Court lacks subject matter jurisdiction.

A motion to dismiss under Rule 12(b)(1) may challenge either the facial sufficiency or the factual truthfulness of a plaintiff's jurisdictional allegations. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). Regardless, jurisdictional issues are for the court to determine. *See Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). When considering a facial challenge, a court must presume that all of the facts alleged by the plaintiff in support of jurisdiction are true.

*See Osborn v. United States*, 918 F.2d 724, 729 (8th Cir. 1990) ("In the first instance, the court restricts itself to the face of the pleadings, and the non-moving party received the same protections as it would defending against a motion brought under Rule 12(b)(6).  The general rule is that a complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" (citations omitted)).   A court confronted with a factual challenge must weigh the conflicting evidence concerning jurisdiction, without presuming the truthfulness of the plaintiff's allegations.  *Land v. Dollar*, 330 U.S. 731, 735 n. 4 (1947); *Osborn*, 918 F.2d at 730.  Defendants in the present case challenge Plaintiffs' jurisdictional allegations on their face, i.e., Defendants claim that Plaintiffs' Complaint, on its face, cannot establish standing to proceed.

## III.  LAW AND ANALYSIS

For this Court to properly exercise jurisdiction, Plaintiffs must satisfy an "irreducible constitutional minimum" under Article III by showing the following:

> (1) an "injury in fact" that is both (a) concrete and particularized, and (b) actual or imminent, rather than conjectural or hypothetical; (2) a causal connection between the alleged injury and the defendant's conduct; that is, that the injury is "fairly traceable" to the challenged action; and (3) that it is likely that a favorable decision will redress the injury.

*Ben Oehrleins and Sons and Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1378 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  In addition to these Article III requirements, the Court is also bound by prudential limitations on its exercise of jurisdiction. These prudential limitations require that a party assert its own legal interests, rather than those of a third party; that a party not assert a "generalized grievance"; and that the party's interests are within the "zone of interests" intended to be protected by the statute, rule or constitutional

-10-

provision upon which the claim is based.  While Defendant states in its brief that it "does not concede that Plaintiffs have constitutional standing," the parties clarified at the hearing that Defendant is not, for purposes of the present motion, challenging Plaintiffs' constitutional standing to bring the present action.  Rather, Defendant challenges Plaintiffs' prudential standing to maintain this suit.

"Standing, whether constitutional or prudential, is a jurisdictional issue which cannot be waived or conceded."  *See Animal Legal Defense Fund, Inc. v. Espy*, 29 F.3d 720, 723 n.2 (D.C. Cir. 1994); *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975) (stating that the question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise").  Indeed, both constitutional and prudential standing must be present, as both are necessary prerequisites to the exercise of jurisdiction.  *See Starr v. Mandanici*, 152 F.3d 741, 750 (8th Cir. 1998) (stating that the court "lacks jurisdiction" if judicially imposed prudential standing limitations are not satisfied).  In the present case, the parties focus on the third inquiry of prudential standing, i.e., whether Plaintiffs' interests are within the "zone of interests" intended to be protected by the statute, rule or constitutional provision upon which their claim is based.

Defendant first cites *Kansas City Power & Light Co. v. McKay*, in support of its claim that Plaintiffs cannot satisfy the "zone of interests" test for prudential standing.  *See* 225 F.2d 924 (D.C. Cir. 1955).[2]  In *Kansas City Power*, the plaintiffs, various electric utility companies in Kansas, Missouri, and Arkansas, sought declaratory relief against various governmental entities.

---

[2] Defendant's brief mistakenly cites *Kansas City Power & Light Co.* as an Eighth Circuit Court of Appeals case.  The case, in fact, was decided by the United States Court of Appeals for the District of Columbia Circuit.

*Id*. at 926.  Plaintiffs sought to enjoin defendants from lending or disbursing funds under the

REA to the Southwestern Power Administration and to federated power cooperatives for the

construction of electric generating and transmission facilities.  *Id*.  Defendants moved to dismiss

the plaintiffs' complaint on the basis that plaintiffs did not have the capacity to show, and did not

show, any injury or interest entitling them to maintain the suit.  *Id*.  Noting that it was

"indisputable that the essence of plaintiffs' complaint is the competition which they will suffer if

the Government's contracts are carried out," the appellate court rejected standing for plaintiffs,

quoting extensively from *Alabama Power Co. v. Ickes*, 302 U.S. 464, 479-80 (1938):

> The only pertinent inquiry, then, is, what enforceable legal right of petitioner do the
> alleged wrongful agreements invade or threaten?  If conspiracy or fraud or malice or
> coercion were involved, a different case would be presented, but in their absence,
> plainly enough, the mere consummation of the loans and grants will not constitute
> an actionable wrong.  Nor will the subsequent application by the municipalities of
> the moneys derived therefrom give rise to an actionable wrong, since such
> application, being lawful, will invade no legal right of petitioner.  The claim that
> petitioner will be injured, perhaps ruined, by the competition of the municipalities
> brought about by the use of the moneys, therefore, presents a clear case of *damnum
> absque injuria*.  Stated in other words, these municipalities have the right under state
> law to engage in the business in competition with petitioner, since it has been given
> no exclusive franchise.  If its business be curtailed or destroyed by the operations of
> the municipalities, it will be by lawful competition from which no legal wrong
> results.

*Kansas City Power*, 255 F.2d at 928.  Thus, the Court concluded "that one whose only injury

will result from lawful competition has no standing to question whether the contracts with the

municipalities were authorized by statute and thus legal."  *Id*. at 928.

The "legal right" or "legal interest" test applied in *Kansas City Power*, however, gave

way to the "zone of interests" test for evaluating standing in *Association of Data Processing

Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970).  In *Data Processing*, the petitioners,

companies that sold data processing services to business generally, challenged a ruling by the

Comptroller of Currency that national banks could make data processing services available to

other banks and to bank customers, as incident to their banking services.  *Id*. at 829.  Relying on

case law requiring a "legal interest" by reason of public charter, contract, statutory protection, or

a congressionally recognized public interest, the Court of Appeals found that the data processors

lacked standing to challenge the Comptroller's decision.  *Id*. at 829.  In reversing, the Supreme

Court found:

> The "legal interest" test goes to the merits.  The question of standing is different.  It
> concerns, apart from the "case" or "controversy" test, the question whether the
> interest sought to be protected by the complainant is arguably within the zone of
> interests to be protected or regulated by the statute or constitutional guarantee in
> question.  Thus the Administrative Procedure Act grants standing to a person
> "aggrieved by agency action within the meaning of a relevant statute."  That interest,
> at times, may reflect "aesthetic, conservational, and recreational" as well as
> economic values.

*Id*. at 830 (internal citations omitted).   Finding that standing may stem from noneconomic

injuries, "as well as from the economic injury [on] which petitioners rely here," the Court noted

that "[w]here statutes are concerned, the trend is toward enlargement of the class of people who

may protest administrative action."  *Id*. at 830.

The Court again discussed the "zone of interests" test in *Clarke v. Securities Industry

Association*, 479 U.S. 388 (1987).  In that case, Security Pacific National Bank applied to the

Comptroller of Currency for permission to offer discount brokerage services both at its branch

offices and at other locations inside and outside of its home state.  *Id*. at 391.  The National Bank

Act limited "'the general business'" of a national bank to its headquarters and branch locations,

however, the Comptroller approved Security Pacific's application on the basis that the

nonchartered offices at which the brokerage services would be offered did not constitute branches under the statute. *Id*. Securities Industry Association ("SIA"), a trade association representing securities brokers, brought an action to reverse the Comptroller's decision. *Id*. at 393. The district court and the appellate court both found that SIA had standing to bring the action, relying on *Data Processing*.

The Supreme Court affirmed and expounded upon the "zone of interests" test, noting: "The essential inquiry is whether Congress 'intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law.'" *Id*. at 399 (quoting *Block v. Cmty Nutrition Inst.*, 467 U.S. 340, 347 (1984)). The Court went on to state:

> The "zone of interest[s]" test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff. . . . [T]he reviewability question turns on congressional intent, and all indicators helpful in discerning that intent must be weighed. . . . [W]e are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes in the [statute at issue].

*Id*. at 399-401. Concluding that there was nothing in the record making "fairly discernible" a congressional intent to preclude review, the Court found that SIA's interests bore a "plausible relationship" to the policies underlying the National Banking Act, and that standing was appropriate. *Id*. at 403.

Shortly after *Clarke* was decided, the Eighth Circuit Court of Appeals examined the "zone of interests" test in *DeLoss v. Department of Housing and Urban Development*, 822 F.2d

-14-

1460 (8th Cir. 1987).  There, the owners of rental property suitable for housing low-income elderly persons sued to challenge the Department of Housing and Urban Development's ("HUD") decision to finance construction of a 36-unit housing project in Spencer for the low-income elderly and to provide rent subsidies for the project.  *Id*. at 1461.   The challenged statute that formed the basis for HUD's action was section 202 of the Housing Act of 1959, which authorized HUD to make loans to private and non-profit organizations for the construction of housing for elderly and handicapped persons.  *Id*. at 1461; *see* 12 U.S.C. § 1701q.  Also at issue was section 8 of the Housing Act of 1937, which authorized rent subsidies to owners of rental housing or section 202 recipients to enable low-income persons to occupy rental units they otherwise could not afford.  *DeLoss*, 822 F.2d at 1461; *see* 42 U.S.C. § 1437f.  Relying on *Data Processors*, the district court found the DeLosses lacked standing to challenge the agency action, as nothing in the statutes or legislative history relating to the section 202/8 programs demonstrated a congressional intent to protect competitors' or residents' interests.  *DeLoss*, 822 F.2d at 1462.

The Eighth Circuit reversed, finding that *Clarke* broadened the zone of interests test such that a right of review is denied only "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Id.* at 1463.  The Eighth Circuit found that sections 202 and 8 required that assistance be granted only in communities having a "need" for it, thus requiring that a local housing assistance plan survey the existing condition of the housing stock in the community before granting benefits under the statutes.  *Id*. at 1464.  "We think this language raises a concern for the interests of competitors who may be adversely affected by an

-15-

award of section 202/8 assistance.  Because the DeLosses are 'competitors who allege an injury that implicates the policies of the relevant statutes,' they 'are very reasonable candidates to seek review of HUD's rulings.'" *Id.* (quoting *Clarke*, 479 U.S. at 403-04).

Regarding the present case, this Court finds *DeLoss* to be precisely on point.  The statutes at issue in *DeLoss* required the granting agency to follow specific guidelines for issuing loans, just as § 950bb and its correspondent regulations contain specific guidelines and prioritization requirements for issuing loans under that statute.  The very purpose of the REA and its amendments is to provide modern conveniences, such as electricity, telephone, and now broadband service, to rural communities that might not otherwise be offered such amenities. This purpose is evidenced in the prioritization scheme requiring that loans be given first to rural communities in which broadband service "is not available."  *See* 7 C.F.R. § 1738.11. Additionally, the regulations related to granting loans specifically provide that applicants under the RUS Program include information in their application outlining the extent to which the proposed community where the loan will be used is unserved or underserved with regard to broadband service.  *Id.*  Incumbent providers in the area must be notified of the application so that they may provide information to the RUS regarding current service in the proposed community.  *Id.*

Mediacom, as a company that already provides good quality, reasonably priced broadband service in the target community, clearly is subject to substantial economic injury should the RUS carry through on loans made in contravention of the statute's purpose and its governing regulations.  Additionally, the exclusivity provisions of the regulations make Mediacom subject to further harm by the agency's allegedly wrongful implementation of the

statute, i.e., Mediacom, as well as all other broadband providers, will now be barred from applying for an RUS Program loan in the Fairfield community.  It seems clear that Mediacom's interests align with the congressional intent in passing the statute and the regulations, that is, to ensure that loan funds are used for furthering the expansion of reasonable, affordable broadband service to unserved and underserved rural communities.

Defendant urges that *DeLoss* is inapposite because the statute there at issue was "need based."  According to Defendant, the Court should rely on certain cases it claims are more analogous to the case at bar:  *Air Courier Conference of America v. American Postal Workers Union*, 498 U.S. 517 (1991) and *Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031 (8th Cir. 2002).[3]  Defendant argues that in each of these cases, the plaintiff was found to lack prudential standing "where its interests in maximizing profits by avoiding competition would likely frustrate the objective of the statute."  Reply Br. at 2.  The Court finds Defendant's arguments to be unpersuasive and the cases to be distinguishable.

The first case urged by Defendant as analogous is *Air Courier*, which Defendant claims "actually limits *Clarke* (thereby limiting *DeLoss* as well)."  Reply Br. at 3.  There, the Supreme Court found that the "zone of interests" of the Private Express Statutes ("PES") did not encompass the interests of postal employees, and that the postal employees therefore lacked standing to object to the Postal Service's suspension of the PES in regards to a practice called "international remailing."  *Air Courier*, 498 U.S. at 519.  The PES is, in effect, a codified

---

[3] Defendant also cites *Grand Council of the Crees (of Quebec) v. Federal Energy Regulatory Commission*, 198 F.3d 950 (D.C. Cir. 2000).  This case, improperly attributed to the Eighth Circuit Court of Appeals in Defendant's Brief, does not offer significant additional law for analysis beyond that provided by *Air Courier* and *Rosebud.*  Accordingly, the Court will not discuss it in depth in this opinion.

-17-

monopoly in favor of the United States Postal Service over the carriage of letters in the United States. *Id.* "The monopoly was created by Congress as a revenue protection measure for the Postal Service to enable it to fulfill its mission. It prevents private competitors from offering service on low-cost routes at prices below those of the Postal Service, while leaving the Service with high-cost routes and insufficient means to fulfill its mandate of providing uniform rates and service to all patrons in all areas . . . ." *Id.* (internal citations omitted). One provision of the PES permits the Postal Service to suspend the PES restrictions when the public interest so requires. *Id.* The Postal Service used this provision to suspend the PES restrictions regarding "international remailing," a process where private courier systems deposit letters destined for foreign addresses with foreign postal systems. *Id.*

The American Postal Workers Union sued, claiming that the record was inadequate to support a finding that the suspension of the PES for international remailing was in the public interest. *Id.* at 520. The district court granted summary judgment in favor of the Postal Service, but the Court of Appeals vacated that decision, finding that the Union had satisfied the zone of interests test under *Clarke*. *Id.* at 521. In making this determination, the Court of Appeals relied on the fact that the PES was reenacted as part of the Postal Reorganization Act ("PRA"), an Act whose "'key impetus' and 'principal purpose' . . . was 'to implement various labor reforms that would improve pay, working conditions and labor-management relations for postal employees.'" *Id.* (quoting *Am. Postal Workers Union v. United States Postal Serv.*, 891 F.2d 304, 310 (D.C. Cir. 1989)). Thus, the appellate court found that the "Unions' asserted interest is embraced directly by the labor reform provisions of the PRA [and] the interplay between the PES and the entire PRA persuades us that there is an 'arguable' or 'plausible' relationship between the

purposes of the PES and the interests of the Unions.'" *Id.* (quoting *Am. Postal*, 891 F.2d at 310).

The Supreme Court reversed the Court of Appeals determination, finding that it had

conflated the zone of interests test with injury in fact. *Id.* at 525. Quoting *Lujan v. National*

*Wildlife Federation*, the Court highlighted the distinction:

> "The failure of an agency to comply with a statutory provision requiring 'on the
> record' hearings would assuredly have an adverse effect upon the company that has
> the contract to record and transcribe the agency's proceedings; but since the
> provision was obviously enacted to protect the interests of the parties to the
> proceedings and not those of the reporters, that company would not be 'adversely
> affected within the meaning' of the statute."

*Air Couriers*, 498 U.S. at 525 (quoting *Lujan*, 497 U.S. 871, 883 (1990)). The relevant inquiry,

then, was the congressional intent in enacting the PES. *Id.*

In arguing that the purposes behind the PRA should be considered in conjunction with

the purposes of the PES in evaluating standing, the Union attempted to rely on the fact that the

*Clarke* court explicitly permitted the review of "any provision that helps us to understand

Congress' overall purposes." *Id.* at 528-29 (quoting *Clarke*, 479 U.S. at 401). In response, the

Supreme Court wrote: "This statement, like all others in our opinions, must be taken in the

context in which it was made." *Id.* at 529. Contrary to Defendant's assertion that this language

limits *Clarke*, and in turn *DeLoss*, the Supreme Court was merely distinguishing the fact that, in

*Clarke*, it was necessary to look at both sections 36 and 81 of the National Banking Act, even

though § 36 was the provision sued upon, because § 81 was an exception to § 36. In *Air*

*Courier*, however, the "only relationship between the PES, upon which the Unions rely for their

claim on the merits, and the labor-management provisions of the PRA, upon which the Unions

rely for their standing, is that both were included in the general codification of postal statutes

embraced in the PRA." *Id.* at 529.  To accept this weak link as sufficient to establish standing, the Court concluded, would "deprive the zone of interests test of virtually all meaning." *Id.* at 530.

Likewise, *Rosebud* is distinguishable from the present case.  There, the Rosebud Sioux tribe leased land to Sun Prairie for construction of a pork production facility.  *Rosebud*, 286 F.3d at 1034.  Because the lease was to include land within the Rosebud Indian Reservation, the Bureau of Indian Affairs ("BIA") had to review and approve the lease, and the National Environmental Policy Act ("NEPA") required that an environmental impact statement ("EIS") be prepared.  *Id.*  The BIA contracted for an environmental assessment and determined that no significant impact would result if the lease was approved.  *Id.*  Almost five months after the lease was approved, the Secretary for Indian Affairs at the Department of the Interior voided the lease, saying the "Finding of No Significant Impact" in the environmental assessment was issued in violation of NEPA.  *Id.*  Both Sun Prairie and the Rosebud Tribe filed suit, and the district court granted a preliminary and, ultimately, a permanent injunction.

The Eighth Circuit Court of Appeals vacated the injunction, finding that Sun Prairie lacked standing to pursue its claims.  Noting that "[p]rudential limits require a plaintiff to show the grievance arguably falls within the zone of interests protected or regulated by the statutory provision invoked in the suit," the appellate court emphasized that the zone of interests test "'is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies.'" *Id.* at 1036 (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)).  None of the three statutes upon which Sun Prairie relied were sufficient to bring their interests within the zone of interests sought to be protected

by those statutes.  *Id*. at 1036-37 (finding that 25 U.S.C. §§ 1a, 81 and 415 were designed only to protect Native American interests).  Further, Sun Prairie's attempted reliance on the statutory provisions of NEPA were unsuccessful, because the purpose of NEPA is solely to protect the environment, whereas the interests of Sun Prairie were solely economic.  *Id*. at 1038.

Defendant would have the Court hold that, because Mediacom's overwhelming interest in this case is an economic one, *Rosebud* prohibits it from suing over the administration of the Farm Bill.  The Court must disagree.  The *Rosebud* Court recognized that "even purely economic interests may confer standing under NEPA if the particular NEPA provision giving rise to the plaintiff's suit evinces a concern for economic considerations."  *Id*. (citing *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1125-26 (8th Cir. 1999) (finding standing proper where a group of plaintiffs sued the Forest Service for improperly restricting visitor and motorboat use in federally held wilderness area:  "We need not consider whether the [plaintiffs] are in fact more concerned with economics than with the welfare of the physical environment.  Regardless of their true intent, they have standing [because, in addition to economic concerns, they also cited their own inability to fully enjoy the wilderness area as a result of the restrictions] to ensure that the agency adequately considers all of the statutorily referenced concerns when balancing the relevant factors in the Final EIS.")).  Moreover, "[p]arties motivated in part by protection of their own economic interests may also challenge agency action [under NEPA] so long as their environmental interests are not so insignificant that they should be disregarded altogether."  *Id*. at 1039 (citing *Robinson v. Knebel*, 550 F.2d 422, 425 (8th Cir. 1977)).

In the present case, it is certainly reasonable to assume that Mediacom's overwhelming

interest in pursuing review of the RUS's actions stems from economic concerns. "[P]arties motivated solely by 'their own economic self-interests and welfare, are singularly inappropriate parties to be entrusted with the responsibility of asserting the public's . . . interest.'" *Id.* (quoting *Churchill Truck Lines, Inc. v. United States*, 533 F.2d 411, 416 (8th Cir. 1976)). The distinction between *Rosebud* and the present case, however, is that Mediacom, like the plaintiffs in *Friends of the Boundary Waters*, also has legitimate interests as a broadband provider in seeing that the provisions of the REA and the Farm Bill are appropriately applied to further the spread of broadband service to unserved and underserved rural areas. It is reasonable to conclude that Congress, in enacting § 950bb, intended for federal funds to be directed to areas where the private sector is not, and is not likely in the future due to financial considerations, meeting consumer needs for broadband services. Such an intent reasonably must have anticipated that a natural corollary to that goal would be to provide existing providers with protection from wrongfully subsidized competitors. Indeed, the provisions of the regulations dealing with notice to, and information to be gathered from, incumbent providers supports such a conclusion. Further, Mediacom, as a broadband provider, is a prime candidate for future loans under the RUS Program, but efforts to obtain such loans would be futile in areas where loans have already been legally or illegally issued, due to the exclusivity provisions of the regulations. It seems clear that a statute designed to encourage the spread of broadband technologies to unserved rural communities would reasonably anticipate that incumbent providers, barred from applying to further the purposes of the statute, might realistically be expected to challenge its wrongful implementation. For these reasons, it appears that Mediacom's interests are well-aligned with the interests sought to be protected by the statute and regulations it alleges are being wrongfully

implemented.

Defendant argues that Plaintiffs' asserted interests are factually unsupported, i.e., there is no evidence in the record that any broadband provider in an unserved community was denied an RUS loan in favor of a loan such as the LISCO loan, in an area where there is already an existing provider. Plaintiffs need not show at this stage of the proceedings, however, proof that positively shows the Defendant has improperly implemented the RUS Program. Rather, the only issue at this extremely early stage of the proceedings is whether Plaintiffs' interests are "*arguably* protected by [§ 950bb and its correspondent regulations] under the zone of interests test," such that standing to proceed is warranted. *Rosebud*, 286 F.3d at 1038 (quoting *Bennett*, 520 U.S. at 175-76) (emphasis added)). Here, Plaintiffs' asserted interests are sufficiently in line with the apparent purposes of the provisions of the REA and the Farm Bill that they claim have been wrongfully applied by the RUS, such that "the injury [plaintiffs] complain[] of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for [the] complaint." *Bennett*, 520 U.S. at 175 (quoting *Data Processing*, 497 U.S. at 883). Mediacom is, therefore, an appropriate entity to bring this suit to protect both its own interests, and those of the public in proper administration of § 950bb.

## IV.  CONCLUSION

For the reasons stated herein, the Court concludes that Mediacom has adequately established both constitutional and prudential standing such that Defendant's Motion to Dismiss (Clerk's No. 3) must be DENIED. Because Mediacom is a named Plaintiff, it is unnecessary to determine at this juncture whether ICTA possesses associational standing. *See Rumsfeld v. Forum for Academic & Inst'l Rights*, 126 S. Ct. 1297, 1303 n.2 (2006) ("The presence of one

party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

IT IS SO ORDERED.

Dated this ___11th___ day of December, 2006.

_____
ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT